# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALEXANDRA UCHENIK,<br><br>individually and on behalf of all others similarly situated,<br><br>               Plaintiff,<br><br>     vs.<br><br>MCGRAW HILL, LLC (f/k/a MCGRAW-HILL GLOBAL EDUCATION HOLDINGS, LLC); PEARSON EDUCATION, INC.; CENGAGE LEARNING, INC.; and EDUCATIONAL PUBLISHERS ENFORCEMENT GROUP,<br><br>               Defendants. | **CIVIL ACTION NO: 1:20-cv-03162**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

### TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................. 1

II.     JURISDICTION AND VENUE ...................................................................... 4

III.    INTERSTATE COMMERCE ........................................................................ 5

IV.     THE PARTIES ................................................................................................ 5

V.      CO-CONSPIRATORS ................................................................................... 6

VI.     FACTUAL ALLEGATIONS ......................................................................... 7

        A. The Pre-Conspiracy Market ................................................................... 7

        B. Defendants Agree to Implement Inclusive Access to Eliminate Price
           Competition for Course Materials ........................................................ 8

        C. Pursuant to Their Agreement, Publisher Defendants Only Sell Course Materials
           Themselves or to Retailer Co-Conspirators .................................... 10

VII.    RELEVANT MARKETS ............................................................................. 13

VIII.   ANTITRUST INJURY ................................................................................. 15

IX.     CLASS ACTION ALLEGATIONS ............................................................. 16

X.      CAUSE OF ACTION ................................................................................... 18

        A. Conspiracy in Restraint of Trade (15 U.S.C. §1).................................. 18

XI.     PRAYER FOR RELIEF................................................................................ 19

XII.    JURY TRIAL DEMAND ............................................................................. 20

Plaintiff Alexandra Uchenik ("Plaintiff"), by and through her attorneys, brings this action on her own behalf, and on behalf of two classes of all others similarly situated, against the dominant publishers of textbooks and other course materials, McGraw Hill, LLC (f/k/a McGraw-Hill Global Education Holdings, LLC) ("McGraw" or "McGraw-Hill"), Pearson Education, Inc. ("Pearson") and Cengage Learning, Inc. ("Cengage"), (collectively, "Publisher Defendants"), and against the Educational Publishers Enforcement Group ("EPEG") (Publisher Defendants and EPEG are collectively referred to herein as "Defendants").  The conduct at issue here began no later than January 1, 2016 and continues into the present (the "Class Period").

## INTRODUCTION

1.     Facing declining profits for higher education textbooks and other course materials ("Course Materials"), Defendants conspired to, and did in fact, restrain trade in that market through agreements among themselves and a variety of "Inclusive Access" agreements with institutions of higher education.  These agreements effectively required Plaintiff and Class Members to purchase, each semester or other time limited period, new, digital copies of assigned Course Materials from the Publisher Defendants or their co-conspirators (or both).  The Publisher Defendants were joined in the conspiracy by the operators of certain official (*i.e.*, institutionally-licensed) on-campus bookstores, including Barnes & Noble College Booksellers, LLC ("B&N") and Follett Higher Education Group, Inc. ("Follett") (collectively, "Retailer Co-Conspirators"), where Plaintiff and Class Members could also purchase Course Materials for classes using Inclusive Access. Defendants' unlawful conspiracy injured Plaintiff and Class Members by foreclosing competition and by raising the costs for Course Materials, without providing any legitimate pro-competitive benefit or justification.

2.     The market for Course Materials is lucrative.  It is estimated that the average student

1

spends $1,000 or more per year on Course Materials, representing nearly $3 billion in annual spending for students awarded federal financial aid.  And the cost of Course Materials keeps rising—at a rate of three times the cost of inflation.

3.      The success of Defendants' scheme relied on the Inclusive Access agreements themselves, which incentivized institutions to enforce a *de facto* requirement that Plaintiff and Class Members purchase "access codes" for Course Material only from the Publisher Defendants and/or the Retailer Co-Conspirators, through a proprietary platform.  Maximizing institutional support was critical to Defendants' scheme, because a federal law requires any institution offering courses using digital access programs—such as Inclusive Access—to allow students enrolled in those classes to  "opt out" of any such program and obtain their books and suppliers from whatever source, and in whatever format, the students choose.

4.      The contractual incentives implemented by the Publisher Defendants, however, were so successful that some institutions effectively jettisoned the opt-out process entirely or listed certain titles in certain courses as "no opt-out" to ensure quotas were met.  More commonly, however, Defendants, the Retailer Co-Conspirators, and the institutions made the "opt-out" process confusing, difficult to navigate, or outright misleading.  For example, an institution may require students to go through a multi-step verification process that includes dire warnings about the consequences of opting-out, such as: being unable to access required Course Materials, assignments, homework problems, quizzes, etc; being "denied extensions on homework while waiting for books"; or being "[un]able to find materials elsewhere."

5.      Another method of reinforcing the conspiracy involved how Plaintiff and Class Members bought Course Materials.  Inclusive Access was designed by the Defendant Publishers to ensure that students taking an Inclusive Access course could either directly pay the Publisher

Defendants for the Inclusive Access "access codes" for a given course using a payment card, or would purchase access codes directly from an official on-campus bookstore, which more often than not was run by a Retailer Co-Conspirator. The Retailer Co-Conspirators actively participated in Defendants' conspiracy and shared the Publisher Defendants' conspiratorial motive to boost their profits by eliminating competition and maintaining and raising prices for Course Materials.

6.     Prior to the creation of Inclusive Access, Class Members had a variety of options in purchasing Course Material. For instance, off-campus bookstores and online retailers offered opportunities to trade, rent, or purchase print or digital Course Materials at lower costs than those charged at the official campus bookstore. There was also a vibrant secondary market for used Course Materials. These varied options of sellers and formats created real competition for traditional publishers, which according to a recent public-interest group study, saved students "hundreds of millions" of dollars. Because of the conspiracy detailed in this Complaint, the market behaves in the opposite way, limiting supply and choices, and costing students money.

7.     The conspiracy alleged herein not only harmed Plaintiff and Class Members by charging them supracompetitive prices for Course Materials, but also negatively impacted the value of the education they were receiving. For instance, because Inclusive Access Course Materials are offered digitally, and because access to those materials expire at the end of the course, Plaintiff and Class Members were deprived of the opportunity to: highlight or otherwise make notes in those materials; keep and refer to those materials later; and/or sell those materials to other students or third-party retailers at the end of the course and recoup part of the purchase price. Professors are also harmed because they must waste valuable, limited class time explaining how to use the online materials, or otherwise having to deal with technical issues—including those that may cause students to miss assignments or lose access to certain materials. Research shows

that 65 percent of students have skipped buying books because of the cost, and 94 percent of those students believed that doing so would hurt their grade.

8.      Thus, actions by Defendants and their co-conspirators to unlawfully restrain trade and charge supracompetitive prices for Course Materials in Inclusive Access courses violates federal antitrust laws.

## JURISDICTION AND VENUE

9.      Plaintiff brings claims under Sections 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, seeking treble damages pursuant to Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15. Plaintiff also brings claims under Section 16 of the Clayton Act, 15 U.S.C. § 26, to obtain injunctive relief and to recover the costs of suit, including reasonable attorneys' fees, for the injuries sustained by Plaintiff and all others similarly situated.

10.     This Court has subject matter jurisdiction over these claims under Section 16 of the Clayton Act, 15 U.S.C. § 26, as well as under 28 U.S.C. §§ 1331, 1337.

11.     The Court has personal jurisdiction over each Defendant because at least one Defendant has their corporate headquarters in this District. The Court also has personal jurisdiction over each Defendant because each Defendant transacts substantial business in this District and has committed acts in furtherance of the conspiracy in this District, including by establishing Inclusive Access programs at institutions in this District.

12.     Venue is proper in this District because Defendant McGraw-Hill has its corporate headquarters in this District and because all the Publisher Defendants transact a substantial amount of business in this District, conspired to exclude and restrain competition in this District, and continue to affect a substantial amount of trade and commerce in this District.

## INTERSTATE COMMERCE

13.     The interstate market for Course Materials has been significantly affected by Defendants' actions.

14.     The Publisher Defendants sell Course Materials through Inclusive Access directly to buyers, including students such as Plaintiff and Class Members, in all 50 states and the District of Columbia.  Retailer Co-Conspirators also sell Course Materials through Inclusive Access directly to buyers, including students such as Plaintiff and Class Members, in all 50 states and the District of Columbia.

15.     The conspiracy alleged here has therefore had a substantial effect on the national market for Course Materials sold through Inclusive Access programs.

## THE PARTIES

16.     Plaintiff Alexandra Uchenik is a resident of Huntingdon Valley, Pennsylvania. During the Class Period, Ms. Uchenik is a student who enrolled in courses using Inclusive Access and: (a) purchased Course Materials through Inclusive Access directly from Publisher Defendants Pearson and Cengage; and (b) purchased Course Materials through Inclusive Access from Retailer Co-Conspirator B&N, which was licensed to operate the official on-campus bookstore.  As a direct and proximate result of Defendants' anticompetitive conduct, Ms. Uchenik paid supracompetitive prices for her Course Materials, was harmed as a result, and will continue to sustain injury when purchasing additional Course Materials unless Defendants are enjoined from continuing their unlawful conduct.

17.     Defendant Cengage Learning, Inc. is a Delaware corporation with corporate headquarters in Boston, Massachusetts.  It publishes and sells Course Materials through Inclusive Access.

18.     Defendant McGraw-Hill Global Education Holdings is a Delaware LLC with corporate headquarters in New York, New York, in this District.  It publishes and sells Course Materials through Inclusive Access.

19.     Defendant Pearson Education, Inc. is a Delaware corporation with corporate headquarters in Upper Saddle River, New Jersey.  It publishes and sells Course Materials through Inclusive Access.

20.     Defendant Educational Publishers Enforcement Group ("EPEG") is an entity created, financed and operated by the Publisher Defendants throughout the entire Class Period, and may be served with summons pursuant to Federal Rule of Civil Procedure 4 through its members, the Publisher Defendants.  EPEG gave the Publisher Defendants opportunities and means to create, implement and maintain the conspiracy alleged here. As detailed below, this included the development and "enforcement" of so-called Anti-Counterfeit Best Practices (the "EPEG Guidelines"), which the Publisher Defendants claim are for the purpose of eliminating counterfeit textbooks in the marketplace.  But the EPEG Guidelines are a pretext used to control who can buy and resell the Publisher Defendants' Course Materials, further cementing the Publisher Defendants' collusive efforts to reduce the supply and access to, and raise prices for, Course Materials.

## CO-CONSPIRATORS

21.     Retailer Co-Conspirator Barnes & Noble College Booksellers, LLC is a Delaware LLC with corporate headquarters in Basking Ridge, New Jersey.  It operates official on-campus bookstores nationwide and sells Course Materials through Inclusive Access directly to students.

22.     Retailer Co-Conspirator Follett Higher Education Group is an Illinois corporation with corporate headquarters in Westchester, Illinois.  It operates official on-campus bookstores

nationwide and sells Course Materials through Inclusive Access directly to students.

## FACTUAL ALLEGATIONS

**The Pre-Conspiracy Market**

23.     Before the creation and widespread adoption of Inclusive Access, higher education students had two choices for accessing required Course Materials: printed, hard-copy materials (for those preferring to work from print), or electronic materials.  And while students were instructed to buy the specific textbooks selected by their professor and the institution for that class, the students could get them from any sources and in any format they wanted.

24.     Specifically, print and electronic textbooks could be bought in either the primary market (for new, unused textbooks, which a student could either keep for future use or re-sell at the semester's end) or a then-vibrant secondary market for used textbooks.

25.     Students also had numerous potential sources for their textbook needs, including official on-campus bookstores, off-campus bookstores in surrounding communities, mail-order from out-of-state retailers, and many online bookstores (like Amazon or Chegg) or sellers offering textbooks on eBay or Craigslist.

26.     A growing secondary market for used books and alternative sources for new textbooks posed a threat to the profits of Publisher Defendants.  In the secondary market, although official on-campus bookstores (including those operated by the Retailer Co-Conspirators) sold used textbooks, contracts with the Publisher Defendants typically required that used versions be priced no higher than 75 percent of the cost of a new book.  But used textbooks sold on Amazon.com, for example, at an average of 58 percent below cost for a new textbook, thereby siphoning business from on-campus bookstores.

27.     Moreover, at that time, student spending on new print or electronic textbooks

substantially declined with the growth of the secondary market for used textbooks and increased competition for new textbooks from alternative retail sources like independent off-campus bookstores and online booksellers. Students had access to lower-priced used books in the secondary market, and more off-campus and online sellers of new textbooks restrained the Publisher Defendants' ability to increase prices of new books sold at on-campus stores. The Publisher defendants and Retailer C0-Conspirators' response to this increased competition was the collusive creation and implementation of Inclusive Access.

### Defendants Agree to Implement Inclusive Access to Eliminate Price Competition for Course Materials

28.     In 2016, the Publisher Defendants formed EPEG, whose ostensible purpose was to fight textbook counterfeiting. However, EPEG's actual purpose was to give the Publisher Defendants the opportunity to communicate with one another to facilitate their collusive imposition of Inclusive Access, and to impose pretextual anti-counterfeiting policies that helped restrict competition for textbooks. All three Publisher Defendants are EPEG members and have been since its inception.

29.     The Publisher Defendants and EPEG developed the EPEG Guidelines, that in effect limit which retailers are permitted to sell textbooks, thereby helping the Publisher Defendants to control the market and to charge higher prices by arbitrarily designating off-campus and online booksellers, who primarily sell used books, to be in violation or not compliant with the EPEG Guidelines.

30.     EPEG created a "white list" of acceptable retailers, and encouraged its membership to refuse to sell to anyone not on the white list, as a way of reducing competition from off-campus and online sellers, whose absence from the white list was meant to show that they were allegedly engaged in counterfeiting while, in effect, they were only competing. EPEG actively participated

in, and facilitated the Publisher Defendants' collusive implementation of, a new program, "Inclusive Access," and EPEG allowed the Publisher Defendants to enforce the terms of Inclusive Access pursuant to their conspiracy to raise and maintain prices for their Course Materials, and eliminate competition from off-campus and online retailers.

31.     Students, like Plaintiff and Class Members, who registered for courses using Inclusive Access, pay for a code that gives them electronic access to the Publisher Defendants' textbooks.  Often, this would include materials like reading assignments and homework problems needed to pass the course that are not available except through Inclusive Access.  Access to the Course Materials expires at the end of the semester or a defined period of time.  And students are typically unable to buy Inclusive Access Course Materials from any other sources, because as detailed in this Complaint, the Publisher Defendants refuse to sell them to off-campus bookstores or online sellers.

32.     Thus, students are effectively required to buy the Inclusive Access Course Materials from Publisher Defendants or Retailer Co-Conspirators to pass the class, and while federal law gives them the right to opt-out of buying Inclusive Access Course Materials, Defendants' conspiracy ensured that those materials are not available from other sources such that any student opting out of buying Inclusive Access Course Materials risks a worse grade in the course because he or she would be unable to complete the necessary assignments and homework problems.

33.     The effect of Inclusive Access is to exclude any competition for Course Materials by eliminating both the secondary market and other sources for students to purchase Inclusive Access Course Materials.

34.     Inclusive Access has allowed the Defendants to slow or stop the decline in profits

that resulted from price competition, and instead maintain and increase profits in the growing Inclusive Access sector through an unlawful conspiracy to restrain trade.

**Pursuant to Their Agreement, Publisher Defendants Only Sell Course Materials Themselves or to Retailer Co-Conspirators**

35.    The Publisher Defendants refuse to sell Inclusive Access Course Materials to any retailers other than official on-campus bookstores run by either the Retailer Co-Conspirators or the institution itself.   On campuses where the official on-campus bookstore is run by a Retailer Co-Conspirator, Inclusive Access is an exclusive arrangement between the Publisher Defendants, the Retailer Co-Conspirator operating the bookstore, and the institution/university.

36.    License agreements between each Publisher Defendant, the Retailer Co-Conspirator, and the institution/university dictate that the Publisher Defendant will only sell Inclusive Access materials at that institution, itself, or through a Retailer Co-Conspirator that runs the official school bookstore.  Upon information and belief, these license agreements are nearly identical to one another and are evidence of collusion between the Publisher Defendants and the Retailer Co-Conspirators to impose Inclusive Access programs.

37.    There are also direct exclusivity agreements between each Publisher Defendant and each Retailer Co-Conspirator, which are operative when there is not a license agreement involving a campus where the Retailer Co-Conspirator operates a bookstore.  Pursuant to these agreements, the Publisher Defendants will not sell Inclusive Access Course Materials to retailers other than the Retailer Co-Conspirator on the campuses where it operates.  This allows for rapid expansion of the Inclusive Access system, because it ensures that Inclusive Access Course Materials are only available at the Retailer Co-Conspirators' bookstores even without a formal license agreement with the institution/university.

38.    When retailers other than the Retailer Co-Conspirators (or on-campus bookstores

run by the institutions) have approached the Publisher Defendants seeking to buy Inclusive Access Course Materials to resell to students, they were refused.  The Publisher Defendants claimed that they either had an exclusive arrangement with the Retailer Co-Conspirators (or college-run on-campus bookstores), or that the Inclusive Access Course Materials were not available in a format that would have allowed the off-campus or online booksellers to resell them.

39.     Examples of the Publisher Defendants refusing to sell Inclusive Access Course Materials to off-campus or online retailers that threatened to compete with them, and their Retailer Co-Conspirators include retailers near Dona Ana Community College, Eastern Kentucky University, and the University of New Mexico.  And in the rare cases where, after litigation by the off-campus bookstores, the Publisher Defendants actually sold Inclusive Access Course Materials to those retailers, they were sold at a substantially higher price than that given to the Retailer Co-Conspirators or college-run stores, putting the off-campus sellers at an immediate competitive disadvantage vis-à-vis the Retailer Co-Conspirators.

40.     Defendants claim that Inclusive Access offers students and institutions technological and pedagogical advantages, but the reality is that Inclusive Access offers the same textbooks and course materials that were available before, but in a restricted, electronic-only format only usable for a limited time.  Students in Inclusive Access courses cannot keep materials for future reference in upper-level courses or their careers.  A study by the Tennessee Board of Regents comparing student performance before and after the use of Inclusive Access found that the percentage of students who got a grade of at least "C" declined in most courses following the switch to Inclusive Access.

41.     Defendants have also asserted that Inclusive Access lowers costs to students. Although in some cases the cost of a given Inclusive Access textbook may be lower than its list

price (which is set by the Publisher Defendants and can be artificially inflated to make it appear that Inclusive Access is a bargain), the cost is still higher than the price would be if there were open competition from used books, off-campus retailers, and online retailers and sellers.

42. For example: at UCLA, the Inclusive Access price of N. Gregory Mankiw's *Principles of Economics* is $108.98, but the same textbook can be rented for about $34 from Amazon or Chegg. At Ohio State, students taking Chemistry 1250/General Chemistry for Engineers are required to buy *Chemistry: The Central Science* (14th Ed.), which has a list price of $98.00, with students able to buy the book through Inclusive Access for $41.62. If students could shop around for a hard copy version of the book outside of Inclusive Access, they would see prices of $25 for used copy and $15 for a rental.

43. The Publisher Defendants buttressed their Inclusive Access conspiracy by sharply reducing the supply of their printed textbooks available for sale or rent in favor of digital-only options only available with an Inclusive Access code. Defendant Pearson's Chief Executive Officer, John Fallon, told the publication InsideHigherEd in a 2019 interview that his company would continue to make printed textbooks available for students to rent but limited the number of copies available for students to purchase. He also stated that sales copies will have relatively high prices, noting that while e-book prices will be around $40 on average, physical book rentals will be priced on average at $60. Defendant Pearson also announced in 2019 its intent to restrict the availability of print editions in favor of digital-only options.

44. Similarly, Defendant Cengage launched a subscription service, bundling their entire digital library for a flat rate. These moves fulfilled the vision laid out by multiple publisher executives: to eliminate the used book market and establish themselves as the sole provider of content via access codes.

45.     Defendant Cengage's Chief Executive Officer, Michael Hansen, has also been quoted saying that the rental book market, for example, is "a market that should fall by the wayside if we do our job the right way."

46.     Defendant McGraw-Hill's Chief Executive Officer, Nana Banerjee, has similarly stated that "there is a half-life that is associated with kind of taking out this used secondary market book enterprise that really has been a disruptor for us."

47.     Indeed, a recent study concluded that elimination of the used book market would likely boost the profits of both the Publisher Defendants and the Retailer Co-Conspirators by as much as 40 percent.

## RELEVANT MARKETS

48.     Plaintiff alleges that Defendants: (1) conspired to unlawfully restrain trade in the market for Course Materials through establishing and implementing the Inclusive Access scheme (described herein), which permitted Defendants and the Retailer Co-Conspirators to restrict the supply of such materials and charge supracompetitive prices; and (2) established a group boycott, with the active participation of EPEG, to prevent Inclusive Access Course Materials from being sold through any sources other than the Retailer Co-Conspirators.  Such conduct, as described herein, is *per se* illegal under the federal antitrust laws and therefore no market definition is required.

49.     However, assuming *arguendo* that Plaintiff's allegations fall within the rule of reason and a relevant market definition is required to be pled: the relevant product market is the market for Course Materials in courses utilizing Inclusive Access (the "Inclusive Access Market"); and the relevant geographic market is the United States.

50.     The conspiracy alleged herein asserts that Defendants used Inclusive Access to

eliminate competition from third-party retailers that sold new Course Materials, used Course Materials, and other electronic Course Materials.

51.     On information and belief, Publisher Defendants have an 80 percent market share of the textbook marketplace, and a 90 percent market share of the Inclusive Access Market as that market is defined herein.

52.     At all relevant times Publisher Defendants have wielded market power in the Inclusive Access Market, which allowed them to profitably maintain the price of Inclusive Access materials at supracompetitive levels without losing substantial sales.

53.     The Course Material marketplace was, historically, a semi-captive market.  An instructor chose the product (*i.e.*, the specific textbook or materials the students must use for that course) and the Publisher Defendants dictated the price.  However, even in that market, the Publisher Defendants' prices were constrained by third-party retailers offering new, used and rental print Course Materials, and by other informal sales and exchanges among and between students.

54.     Defendants' Inclusive Access scheme altered these market dynamics to wholly captivate the market such that the Inclusive Access Market is now a product market that consists of only Inclusive Access Course Materials.  Any potential substitute products have been eliminated.  Students may not purchase Course Materials outside of those offered on the Inclusive Access Market, as Course Materials are only available from the official on-campus retailer, which is run by Retailer Co-Conspirators or by the institution itself.  Other third-party retailers cannot generally access the Course Materials—and even if they can, the materials are more expensive and therefore unable to constrain official on-campus retailer prices.

55.     The relevant geographic market is the United States with submarkets at each

14

individual institution that offers Inclusive Access.  Students must purchase Inclusive Access Couse

Materials from the Publisher Defendants or *their* institution's official on-campus bookstore and

may not purchase Course Materials from the bookstores of other Inclusive Access institutions.

56.    In the rare circumstances that Course Materials are available outside the official on

campus bookstore, those materials are more expensive.

57.    The Inclusive Access Market is susceptible to collusion due to the small number of

dominant publishers, official on-campus bookstores primarily operated by the Retailer Co-

Conspirators that have no incentive to offer lower prices, a captive market of students who require

Course Materials for their studies, and high barriers to entry in due to Defendants longstanding

relationships with Course Material authors, professors, and institutions.

58.    If Defendants' actions are not enjoined, the Inclusive Access Market is likely to

expand to additional Course Materials, courses and institutions, resulting in even higher prices and

reduced choice for students throughout the United States.

**ANTITRUST INJURY**

59.    The actions by Defendants have harmed Plaintiff and Class Members who attended

institutions using Inclusive Access because it effectively forced Plaintiff and Class Members to

purchase Inclusive Access Course Materials either directly from the Publisher Defendants, and/or

directly from the Retailer Co-Conspirators, at prices that were higher than they otherwise would be

if those Course Materials were available in multiple formats and from multiple sources in a truly

competitive market.

60.    Absent Defendants' conduct, Plaintiff and Class members would have numerous

alternatives when purchasing Course Materials.  For instance, third-party retailers have traditionally

offered new and used versions of print textbook, as well as rental options.  Third-party retailers

even provided students the option to purchase electronic versions of the relevant Course Materials. Students also have developed their own informal market for Course Materials, selling or exchanging prior course materials on websites like e-Bay, Facebook Marketplace, or Craigslist. Genuine competition between those alternative options and the Inclusive Access Market would lower prices for Course Materials.

61.     Consequently, Plaintiff and Class Members have suffered antitrust injury as a result of Defendants' conduct.

## CLASS ACTION ALLEGATIONS

62.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23, on her own behalf, and as a representative of each of the following defined Classes:

> **The Publisher-Purchaser Class**: All students at institutions of higher education in the United States who purchased Course Materials through Inclusive Access directly from one or more of the Publisher Defendants from January 1, 2016 until the effects of Defendants' conspiracy end ("Class Period"). Excluded from the Publisher-Purchaser Class are: Defendants, their subsidiaries, parents, affiliates, joint ventures, and employees and co-conspirators; federal governmental entities and instrumentalities; states and their subdivisions, agencies, and instrumentalities; and any judge(s) or jurors assigned to this case.

> **The Retailer-Purchaser Class**: All students at institutions of higher education in the United States who purchased Course Materials through Inclusive Access directly from a licensed on-campus bookstore operated by a Retailer Co-Conspirator from January 1, 2016 until the effects of the conspiracy end ("Class Period"). Excluded from the Retailer-Purchaser Class are the Defendants, their subsidiaries, parents, affiliates, joint ventures, and employees and co-conspirators; federal governmental entities and instrumentalities; states and their subdivisions, agencies, and instrumentalities; and any judge(s) or jurors assigned to this case.

63.     The Classes are individually so numerous that joinder of all members would be impracticable. Even though the exact number of members of each Class is unknown at this time, based on the nature of the trade and commerce involved, Plaintiff reasonably believes that there are thousands (if not millions) of members of the Classes and that their identities can be readily ascertained from records in the possession of the Publisher Defendants, the Retailer Co-

Conspirators, and third parties.

64.     Plaintiff's claims are typical of the claims of other Class Members.

65.     Plaintiff will fairly and adequately protect the interests of the Classes and have retained counsel competent and experienced in class action and antitrust litigation.  Plaintiff's interests are coincident with, and not antagonistic to, the interests of the Classes.

66.     Plaintiff and all Class Members have sustained damages during the applicable Class Period due to their purchases of Course Materials through Inclusive Access at supracompetitive prices from the Publisher Defendants and/or the Retailer Co-Conspirators.

67.     Defendants' anticompetitive conduct (as alleged herein), the impact of that conduct, and the relief sought by Plaintiff on behalf of herself and the Classes, are all issues and questions common to Plaintiff and the Classes.  Other questions of fact and law common to the Classes include, but are not limited to:

- Whether Course Materials is a relevant product market;

- Whether the United States is a relevant geographic market;

- Whether the Publisher Defendants had market power in Inclusive Access Market;

- Whether the Publisher Defendants abused their market power;

- Whether the Defendants and the Retailer Co-Conspirators agreed or combined to restrain competition and exclude competitors from the relevant markets;

- Whether Defendants and the Retailer Co-Conspirators conspired to fix, raise, maintain, or stabilize the price of Course Materials or otherwise restrain trade in the Inclusive Access Market; and

17

- Whether Plaintiff's interests are typical of, and not antagonistic to, those of other or absent members of the Classes, such that she can fairly and adequately represent and protect their interests.

68.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.  Indeed, a class action achieves substantial economies of time, effort, and expense, and assures uniformity of decision as to persons similarly situated without sacrificing procedural fairness.  Moreover, there are no material difficulties in the management of this action as a class action on behalf of the Classes.

## CAUSE OF ACTION

### Conspiracy in Restraint of Trade (15 U.S.C. §1)

69.     Plaintiff repeats and reiterates each of the allegations contained in the paragraphs above as if fully set forth herein.

70.     Defendants and their Retailer Co-Conspirators conspired to restrain trade by: (1) implementing Inclusive Access through agreements with universities and other such institutions that effectively mandated students buy all Course Materials through Inclusive Access directly from Defendants and/or their Retailer Co-Conspirators, and which prohibited the sale of non-Inclusive Access Course Materials in Inclusive Access courses; and (2) by destroying the secondary market for Course Materials by collusively restricting the ability of non-conspirators, such as online retailers and off-campus bookstores, to resell the Publisher Defendants Course Materials, including intentionally using Defendant EPEG's  to keep potential competitors from threatening the success of their cartel by offering lower prices to Plaintiff and members of the Classes.

71.     Defendants' scheme was successful.  They were able to create a captive market for

Course Materials and eliminate competition, thereby allowing them to raise prices without losing demand. Plaintiff and Class Members were subsequently injured in their business or property by Defendants' conduct, as they were forced to pay those supracompetitive prices because they had no reasonable alternatives for Course Materials for their Inclusive Access courses.

72.     Plaintiff and Class Members also seek an injunction against Defendants under § 16 of the Clayton Act that prevents and restrains them from engaging in similar conduct to that which is alleged above.

**PRAYER FOR RELIEF**

73.     WHEREFORE, Plaintiff and Class Members hereby respectfully request that:

a)     The Court determine the federal antitrust claims alleged herein may be maintained as a class action under F.R.C.P. 23;

b)     The Court appoint Plaintiff as a Class Representative for both of the Classes defined above, and her counsel of record as lead class counsel for both Classes;

c)     The unlawful agreements, conduct, contracts, conspiracy, or combination alleged herein adjudged and decreed to be a restraint of trade or commerce in violation of Section 1 of the Sherman Act;

d)     Plaintiff and the Classes recover trebled damages, other monetary relief, and civil penalties, and that a judgement be entered in favor of Plaintiff and the Classes against Defendants;

e)     Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined

and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein; from entering into any other conspiracy alleged herein; from entering into any other contract, conspiracy, or combination having a similar purpose or effect; and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

f) Plaintiff and the Classes be awarded pre- and post-judgment interest at the highest legal rate, accruing from the earliest date permitted by law;

g) Plaintiff and the Classes recover the costs of this suit, including reasonable attorneys' fees, as provided by law; and

h) Plaintiff and the Classes recover any additional relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

**DATED**: April 22, 2020

Respectfully submitted,

/s/ Robert N. Kaplan
Robert N. Kaplan
Gregory K. Arenson
Matthew P. McCahill
Aaron L. Schwartz
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
rkaplan@kaplanfox.com
garenson@kaplanfox.com
mmccahill@kaplanfox.com
aschwartz@kaplanfox.com

Joshua H. Grabar
**GRABAR LAW OFFICES**
1735 Market Street, Suite 3750
Philadelphia, PA 19103
Tel: (267) 507-6085
jgrabar@grabarlaw.com

Marc H. Edelson
**EDELSON & ASSOCIATES, LLC**
3 Terry Drive, Suite 205
Newtown, PA 18940
Tel: (215) 867-2399
medelson@edelson-law.com