UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE INCLUSIVE ACCESS COURSE MATERIALS ANTITRUST LITIGATION | MASTER FILE NO. 20 MDL NO. 2946 (DLC) |
| This Document relates to: 20cv6339 | |

## REPLY MEMORANDUM OF LAW
## IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
## RETAILER PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT

**FRESHFIELDS BRUCKHAUS DERINGER US LLP**
700 13th Street NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
Facsimile: (202) 777-4555
*On behalf of Defendant Cengage Learning, Inc.*

**PATTERSON BELKNAP WEBB & TYLER LLP**
1133 Avenue of the Americas
New York, New York 10036
Telephone: (212) 336-2000
Facsimile: (212) 336-2222
*On behalf of Defendant McGraw Hill LLC*

**STEPTOE & JOHNSON LLP**
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902
*On behalf of Defendant Pearson Education, Inc.*

**GIBSON, DUNN & CRUTCHER LLP**
555 Mission Street, Suite 3000
San Francisco, California 94105-0921
Telephone: (415) 393-8200
Facsimile: (415) 393-8306
*On behalf of Defendants Barnes & Noble College Booksellers, LLC and Barnes & Noble Education, Inc.*

**WILLKIE FARR & GALLAGHER LLP**
300 N. LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 728-9000
Facsimile: (312) 728-9199
*On behalf of Defendant Follett Higher Education Group, Inc.*

## TABLE OF CONTENTS

I.  Introduction ................................................................................................................. 1

II.  Retailer Plaintiffs Lack Antitrust Standing ......................................................... 1

III.  The Section 1 Claims Should Be Dismissed ....................................................... 5

    A.  Retailer Plaintiffs Fail To Allege A Horizontal Or Hub-And-Spoke
    Conspiracy ........................................................................................................ 5

        1.  Retailer Plaintiffs Do Not Allege Parallel Conduct ................................ 5

        2.  Independent Self-Interest Is An "Obvious Alternative Explanation" ........ 7

        3.  Retailer Plaintiffs Do Not Adequately Allege "Plus Factors" ................. 8

    B.  Retailer Plaintiffs Do Not Allege An Unreasonable Restraint Of Trade .............. 9

        1.  Retailer Plaintiffs Fail To Allege Any Per Se Violation........................... 9

        2.  Retailer Plaintiffs Fail To Define A Plausible Relevant Market ............. 10

        3.  Retailer Plaintiffs Fail To Allege Adverse Effects On Competition ....... 12

        4.  Retailer Plaintiffs Do Not Allege An Exclusive Dealing Claim.............. 12

IV.  The Section 2 Claims Should Be Dismissed..................................................... 12

    A.  Retailer Plaintiffs Do Not Allege Monopoly Power........................................... 12

    B.  Retailer Plaintiffs Do Not Allege Anticompetitive Conduct .............................. 13

V.  The Robinson-Patman Act ("RPA") Claims Should Be Dismissed ............................... 14

VI.  Retailer Plaintiffs' State Law Claims Should Be Dismissed. .......................................... 15

VII.  Conclusion ........................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ambook Enters. v. Time Inc.*,
    612 F.2d 604 (2d Cir. 1979) ........................................................................................9

*Ariz. v. Maricopa Cty. Med. Soc.*,
    457 U.S. 332 (1982) .....................................................................................................9

*Atl. Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328 (1990) .....................................................................................................3

*Bell Atl. v. Twombly*,
    550 U.S. 544 (2007) ...................................................................................................13

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
    603 F.2d 263 (2d Cir. 1979) ......................................................................................14

*Broad. Music, Inc. v. Columbia Broad. Sys.*, *Inc.*,
    441 U.S. 1 (1979) .......................................................................................................10

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977) .....................................................................................................1

*Capital Imaging Assocs. v. Mohawk Valley Med. Assocs.*,
    996 F.2d 537 (2d Cir. 1993) ........................................................................................9

*Coalition for a Level Playing Field, LLC v. Autozone, Inc.*,
    2001 WL 1763440 (E.D.N.Y. Oct. 18, 2001) ...........................................................14

*In re Credit Default Swaps Antitrust Litig.*,
    2014 WL 4379112 (S.D.N.Y. Sept. 4, 2014) ......................................................12, 13

*Dane v. United Healthcare Ins. Co.*,
    974 F.3d 183 (2d Cir. 2020) ......................................................................................13

*Daniel v. Am. Bd. of Emergency Med.*,
    428 F.3d 408 (2d Cir. 2005) ........................................................................................3

*Denny's Marina, Inc. v. Renfro Prods., Inc.*,
    8 F.3d 1217 (7th Cir. 1993) .........................................................................................9

*E. & G. Gabriel v. Gabriel Bros.*,
    1994 WL 369147 (S.D.N.Y. July 13, 1994) .............................................................11

*E & L Consulting, Ltd. v. Doman Indus. Ltd.,*
    472 F.3d 23 (2d Cir. 2006)...................................................................................12

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.,*
    129 F.3d 240 (2d Cir. 1997)...............................................................................12

*In re Electronic Books Antitrust Litig.,*
    859 F. Supp. 2d 671 (S.D.N.Y. 2012).............................................................6, 10

*FTC v. Ind. Fed'n of Dentists,*
    476 U.S. 447 (1986)...........................................................................................10

*FTC v. Staples, Inc.,*
    190 F. Supp. 3d 100 (D.D.C. 2016)...................................................................11

*Full Draw Prods. v. Easton Sports, Inc.,*
    182 F.3d 745 (10th Cir. 1999) .............................................................................4

*Gatt Comms. v. PMC Assocs.,*
    711 F.3d 68 (2d Cir. 2013)................................................................................3, 4

*Gelboim v. Bank of Am.,*
    823 F.3d 759 (2d Cir. 2016).................................................................................6

*In re Generic Pharm. Pricing Antitrust Litig.,*
    394 F. Supp. 3d 509 (E.D. Pa. 2019) ..................................................................6

*Hack v. President & Fellows of Yale Coll.,*
    237 F.3d 81 (2d Cir. 2000).................................................................................11

*Innomed Labs, LLC v. ALZA Corp.,*
    368 F.3d 148 (2d Cir. 2004)...............................................................................14

*In re Interest Rate Swaps Antitrust Litig.,*
    261 F. Supp. 3d 430 (S.D.N.Y. 2017)........................................................5, 7, 8, 9

*IQ Dental Supply, Inc. v. Henry Schein. Inc.,*
    924 F.3d 57 (2d Cir. 2019)................................................................................2, 4

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.,*
    383 F. Supp. 3d 187 (S.D.N.Y. 2019)................................................................14

*LLM Bar Exam, LLC v. Barbri, Inc.,*
    271 F. Supp. 3d 547 (S.D.N.Y. 2017)..................................................................6

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.,*
    709 F.3d 129 (2d Cir. 2013).........................................................................5, 7, 8

*MM Steel, L.P. v. JSW Steel (USA) Inc.,*
   806 F.3d 835 (5th Cir. 2015) ...................................................................10

*In re Musical Instruments & Equip. Antitrust Litig.,*
   798 F.3d 1186 (9th Cir. 2015) ...................................................................6

*NicSand Inc. v. 3M,*
   507 F.3d 442 (6th Cir. 2007) (en banc) ....................................................2

*Pearson Education, Inc. v. Allen Air Conditioning Co.,*
   2014 WL 2154099 (S.D.N.Y. May 22, 2014) ...........................................3

*PepsiCo, Inc. v. Coca-Cola Co.,*
   315 F.3d 101 (2d Cir. 2002)...............................................................11, 13

*Philadelphia Taxi Ass'n v. Uber Tech.,*
   886 F.3d 332 (3d Cir. 2018).......................................................................2

*In re Processed Egg Prods. Antitrust Litig.,*
   821 F. Supp. 2d 709 (E.D. Pa. 2011) .....................................................4, 7

*Smugglers Notch Homeowners' Ass'n, Inc. v. Smugglers' Notch Mgmt. Co., Ltd.,*
   414 F. App'x 372 (2d Cir. 2011) .............................................................11

*Tops Mkts., Inc. v. Quality Mkts., Inc.,*
   142 F.3d 90 (2d Cir. 1998)......................................................................13

*Toys 'R' Us, Inc. v. FTC,*
   221 F.3d 928 (7th Cir. 2000) ..................................................................10

*Tru-Art Sign Co., Inc. v. Local 137, Sheet Metal Workers Int'l Ass'n,*
   2013 WL 12368715 (E.D.N.Y. 2013).....................................................11

*United States v. Apple, Inc.,*
   791 F.3d 290 (2d Cir. 2015)..................................................................5, 10

*United States v. Socony-Vacuum Oil Co.,*
   310 U.S. 150 (1940).................................................................................9

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,*
   540 U.S. 398 (2004)................................................................................13

*Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.,*
   546 U.S. 164 (2006)................................................................................14

*Xerox Corp. v. Media Scis. Int'l, Inc.,*
   511 F. Supp. 2d 372 (S.D.N.Y. 2007)...................................................4, 5

## I.    Introduction

Retailer Plaintiffs seek to salvage their claims largely by running away from their own allegations.  In their opposition papers, ECF No. 119 ("Opp."), they argue that Inclusive Access ("IA") has doomed competition but, in their Second Amended Complaint ("SAC"), they acknowledge that there is ongoing, robust competition among publishers and retailers years after the alleged IA "conspiracy" began.  They contend that IA programs were possible only because Defendants entered into an agreement to force "simultaneous" and "lockstep" introduction at universities but, at the same time, allege that IA was introduced separately at hundreds of schools at varying points in time and grew organically over a six-year period.  They gesture toward a massive purported conspiracy between Defendants and these hundreds of individual universities, but fail to identify any communications, common motives, or other indicia of collusion among any of the alleged conspirators.  And they ignore their own allegations about the historical decline in print textbook sales that each Publisher has experienced, which provides an obvious alternative explanation for Defendants' independent decisions to develop and market IA to universities.  Indeed, Retailer Plaintiffs share the same motivations as Defendants: not wishing to be left behind, they complain that they have not been permitted to sell materials through IA.  But the antitrust laws were not designed to bail out competitors who fail to keep pace with an evolving market.

Retailer Plaintiffs have had their chance to plead their case.  After three attempts (one in the transferor court and two here), they still fail to state viable claims.  For the reasons set out in more detail below, Retailer Plaintiffs' claims should be dismissed with prejudice.

## II.    Retailer Plaintiffs Lack Antitrust Standing

Although Retailer Plaintiffs acknowledge that antitrust standing requires specific allegations of injury to "competition not competitors," *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977), and a causal connection between that injury and the "specific

practice at issue," Opp. at 4 (quoting *IQ Dental Supply, Inc. v. Henry Schein. Inc.*, 924 F.3d 57, 62-63 (2d Cir. 2019)), Retailer Plaintiffs cannot meet that standard merely by uttering conclusory buzzwords like "artificial limitations on supply" and "higher prices" without underlying factual allegations. *See* Opp. at 5.[1]  That is especially so given that other allegations in the SAC describe a robustly competitive marketplace for digital and physical course materials, completely undermining the suggestion of any harm to competition.  ECF No. 95 ("Mem.") at 9-11; *see, e.g.*, SAC ¶¶ 3, 5, 7, 11, 14, 86-88, 169-71, 262, 287-93.

Retailer Plaintiffs argue that competition occurred only "*before* the conspiracy," Opp. at 7, but the SAC alleges otherwise, including that Retailer Plaintiffs continue to "directly compet[e]" with Retailer Defendants, SAC ¶ 287, and with other brick-and-mortar retailers and online retailers, and that Publishers compete to sell course materials based on "type, content, quality, and service." *Id.* ¶ 10; *see also id.* ¶¶ 11, 14, 81-82, 86, 287-93; Mem. at 9-10.  Indeed, the SAC includes price lists for textbooks that were allegedly sold side-by-side at the same time by Retailer Defendants, Retailer Plaintiffs, and online retailers such as Amazon and Chegg, long after the purported conspiracy allegedly started (2018-2020).  *See* SAC ¶¶ 169-71; *infra* Section III.A.1.

Retailer Plaintiffs also allege that retailers compete to operate university bookstores and acknowledge that Retailer Defendants offer better terms and "increased … incentives" to their customers—the universities—to secure such opportunities.  SAC ¶¶ 262; *see also id.* ¶¶ 232, 264; Mem. at 10.  These increased incentive payments to customers are a quintessential example of healthy competition.  *See NicSand Inc. v. 3M*, 507 F.3d 442, 451-53 (6th Cir. 2007) (en banc)

---

[1]  Retailer Plaintiffs do not dispute that harm to revenues or profits is not competitive harm; nor do they explain how their lower profits somehow resulted in consumer harm.  As a result, they fail to distinguish *Philadelphia Taxi Ass'n v. Uber Tech*., Inc., 886 F.3d 332 (3d Cir. 2018).  *See* Opp. at 7.  In *Uber*, the court affirmed the dismissal of the complaint because plaintiffs "fail[ed] to aver an antitrust injury, such as a negative impact on consumers or to competition in general" when they merely pleaded their "own injury, namely financial hardship."  886 F.3d at 344.  Financial hardship is precisely what Retailer Plaintiffs plead here.  *See* SAC ¶¶ 10, 66, 141, 158-59, 304.

("Rather than upsetting the competition-enhancing goals of the antitrust laws, the [upfront] payments furthered them."); P. Areeda & H. Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 768b3 (5th ed.) (citing *NicSand*) ("A large upfront fee is effectively a mechanism for 'purchasing' the retailer's shelf space, and generates a positive payoff …. Without a claim of prices below cost, the plaintiff could complain only that it had lost a competitive bidding battle."). Competition among retailers means that universities pay less and receive more for bookstore services. *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990) ("Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition."). And, although Retailer Plaintiffs assert that IA does not benefit students, the fact that Retailer Plaintiffs themselves seek to distribute course materials through IA only illustrates its draw. *See* SAC ¶¶ 286-93.[2]

Retailer Plaintiffs alternatively attempt to establish standing by asserting that Defendants have "'artificially restricted' the output [of IA]." Opp. at 6. But, as in *Pearson Education, Inc. v. Allen Air Conditioning Co.*, Retailer Plaintiffs have failed to allege that the use of IA "result[ed]" in *any* "decrease in output." 2014 WL 2154099, at *8 (S.D.N.Y. May 22, 2014). To the contrary, the enhanced sell-through of materials delivered by IA actually requires higher output to keep pace with increased sales. SAC ¶¶ 36-37, 248, 262-64. Nor do the allegations support the contention that either "competing products" or "the entire secondary market" has been eliminated. *Compare* Opp. at 5 *with* SAC ¶¶ 86, 169-71 (comparing prices for competing products sold via Amazon, Chegg, Retailer Plaintiffs, and Defendants from 2018-2020). Notwithstanding Retailer Plaintiffs'

---

[2] Retailer Plaintiffs attempt to distinguish *Gatt Comms. v. PMC Assocs.*, 711 F.3d 68 (2d Cir. 2013), and *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408 (2d Cir. 2005), because "Plaintiffs never participated in Defendants' scheme," Opp. at 11. But that fact is irrelevant; what matters is that they now seek to join the conduct about which they complain, a request not cognizable under the antitrust laws. *Daniel*, 428 F.3d at 441; *Gatt*, 711 F.3d at 76. Even assuming that a cartel member could bring claims against the cartel, Opp. at 11 n.8, no case recognizes antitrust injury where a company wanted to join that cartel, but could not. *Daniel*, 428 F.3d at 440.

bald assertion that IA has decreased the number of "products" available to consumers (i.e., the unnamed university co-conspirators or students), Opp. at 8, the SAC makes clear that IA actually provides more, not fewer, options to universities and their faculty, SAC ¶¶ 4, 16, 161 (automatic subscription and billing), ¶ 97 ("one-stop-shop"); *see also id.* ¶ 120.[3]

Retailer Plaintiffs also have not alleged a direct causal link between Defendants' conduct and any claimed antitrust injury. *See Gatt*, 711 F.3d at 76-77. They rely only on the utterly implausible theory—unsupported by any facts—that Defendants "coerc[ed] and constrain[ed]" hundreds of unnamed (largely public) universities into intentionally conspiring to further a scheme that allegedly harmed their students' interests. Opp. at 9. This, too, warrants dismissal.

None of the cases on which Retailer Plaintiffs rely suggests that they have standing. As explained in Section III.A.2, *infra*, IA made independent business sense for each Defendant given the "decline in sales of new textbooks" and "sinking" profits from the old model of selling solely print textbooks. SAC ¶ 121; *see also* Mem. at 14-17. By contrast, cases cited by Retailer Plaintiffs involved alleged group boycotts without any business justification. *See In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 724 (E.D. Pa. 2011) (simultaneous adoption of output-restricting rules "without any legitimate business reasons"); *Full Draw Prods. v. Easton Sports, Inc.*, 182 F.3d 745, 752–54 (10th Cir. 1999) (boycott of specific trade show not motivated by "legitimate business reasons, but … out of a desire to destroy the [plaintiff]"). Others involved supplier boycotts that foreclosed the plaintiff's preexisting distribution channel, *see IQ Dental Supply*, 924 F.3d at 61, 67-68; here, in contrast, the allegations demonstrate that traditional distribution models remain available and Retailer Plaintiffs continue to compete. Finally, *Xerox*

---

[3] Although Retailer Plaintiffs argue that if universities "were free to purchase Course Materials as they see fit, they would not choose IA," Opp. at 16, that assertion directly conflicts with the allegation that the universities are willing co-conspirators.

*Corp. v. Media Scis. Int'l, Inc.* involved an antitrust counterclaim stemming from a patent infringement suit, not the introduction of a new business model, as alleged here.  511 F. Supp. 2d 372, 381 (S.D.N.Y. 2007).

## III.    The Section 1 Claims Should Be Dismissed

### A.    Retailer Plaintiffs Fail To Allege A Horizontal Or Hub-And-Spoke Conspiracy[4]

Retailer Plaintiffs allege no "direct evidence" of a conspiracy, which must be "explicit and require[] no inferences to establish" an unlawful agreement.  *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 461 (S.D.N.Y. 2017).  Retailer Plaintiffs point variously to the EPEG anti-counterfeiting guidelines (which do not even refer to IA), certain investor calls (many taking place as late as 2019—well after IA was first introduced), and allegations that some students were unable to opt out of IA programs, but none of this demonstrates the existence of an explicit agreement between any Defendants.

Nor do Retailer Plaintiffs allege circumstantial evidence that "lead[s] to an inference of conspiracy."  *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 137 (2d Cir. 2013).  To the contrary, the SAC acknowledges that each Defendant's independent self-interest motivated its separate efforts to expand digital course materials and IA over a six-year period.  Absent allegations of parallel conduct or any of the "plus factors" that could provide circumstantial evidence of an unlawful agreement, Retailer Plaintiffs' Section 1 claims fail.

#### 1.    Retailer Plaintiffs Do Not Allege Parallel Conduct

Retailer Plaintiffs argue that IA developed as a result of "lockstep actions" or a "simultaneous change," Opp. at 14, 18, but that is contradicted by their own allegations that IA

---

[4]  Because Retailer Plaintiffs have failed to allege any horizontal agreement at any level, they have also failed to allege a "hub-and-spoke" conspiracy.  *See United States v. Apple, Inc.*, 791 F.3d 290, 314 (2d Cir. 2015).

expanded gradually and non-linearly across hundreds of universities at various unspecified times over a six-year period. *E.g.*, SAC ¶ 134 (describing incremental growth of IA classes as "common across many universities"); Mem. at 17. Although Retailer Plaintiffs insist otherwise, the "slow adoption of similar policies does not raise the specter of collusion." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1195-96 (9th Cir. 2015); *see also LLM Bar Exam, LLC v. Barbri, Inc.*, 271 F. Supp. 3d 547, 579-80 (S.D.N.Y. 2017) ("[A]t different times over the span of several years ... independent responses to common stimuli [were] not a coordinated effort to stifle competition.").

Retailer Plaintiffs' cited cases confirm that conduct is considered "parallel" only if it occurs in a matter of days or, at most, months. This Court held in *In re Electronic Books Antitrust Litigation* that parallelism was plausibly alleged where each defendant "signed … an agreement with Apple *in the days leading up* to the … iPad launch event." 859 F. Supp. 2d 671, 683 (S.D.N.Y. 2012) (emphasis added); *see also Gelboim v. Bank of Am.*, 823 F.3d 759, 765-66 (2d Cir. 2016) (coordination of *daily* LIBOR rate submissions); *In re Generic Pharm. Pricing Antitrust Litig.*, 394 F. Supp. 3d 509, 519-20 (E.D. Pa. 2019) (price increases over a *three-month period*). The absence of temporal parallelism here renders implausible any inference of conspiracy between the Publisher Defendants, Retailer Defendants, and hundreds of unnamed conspiring universities.

Further, as Defendants have argued, substantial differences between the cited IA contracts negates any inference of conspiracy. *See* Mem. at 18-19. Retailer Plaintiffs accuse Defendants of "cherry pick[ing] three contracts" with dissimilar terms, Opp. at 22, but these were the contracts *specifically identified* in their pleading, SAC ¶ 284. It is Retailer Plaintiffs' burden to plausibly allege parallel conduct—their own anecdotal examples support the opposite conclusion.

### 2.  Independent Self-Interest Is An "Obvious Alternative Explanation"

Retailer Plaintiffs do not seriously dispute that there is an "obvious alternative explanation for [D]efendants' common behavior." *Interest Rate Swaps*, 261 F. Supp. 3d at 464.  The SAC alleges that each Publisher experienced "a decline in sales of new textbooks" and "sinking" profits, eventually making the old business model of selling print textbooks untenable.  SAC ¶ 121. Around the same time, the U.S. Department of Education made IA programs more attractive to universities by permitting them to add course material fees to student tuition bills.  *Id.* ¶ 409. Against this backdrop, it made "perfect business sense" for each Publisher individually to move to new distribution systems with lower costs and better sales—irrespective of the actions of other publishers.  *Citigroup*, 709 F.3d at 138; *see also* SAC ¶¶ 36, 122, 133, 143.  Retailer Plaintiffs seek to re-cast these external incentives as evidence of "common motive," Opp. at 21, but they fail to explain why the new regulations and movement toward a more profitable digital platform did not make it in each Publisher's interest to independently pursue IA programs.  Nor do they explain why it did not make sense for Retailer Defendants, each of which independently benefited from IA programs through higher revenue resulting from increased unit sales, to adopt IA without regard to the actions of other retailers.[5]  SAC ¶¶ 36-37, 122, 248, 263.

Retailer Plaintiffs' only response is to suggest that Defendants needed each other to "simultaneously and identically change[] the product format from various types to solely IA." Opp. at 16.  However, the pleaded facts simply do not raise a plausible inference that the success of each Publisher's IA program depended on whether other Publishers followed suit.  Moreover, Retailer Plaintiffs' argument improperly equates the growth of digital products (which Retailer

---

[5]  Retailer Plaintiffs cite *In re Processed Egg Products*, where defendants agreed to egg producer guidelines, such as increased cage space and reduced chick hatch requirements, that were contrary to each defendant's individual self-interest absent an agreement.  821 F. Supp. 2d at 725.  In contrast, Retailer Plaintiffs here do not identify any aspect of IA that is detrimental to any Defendant's individual self-interest.

Plaintiffs do not challenge) with IA. While Retailer Plaintiffs consistently conflate the two, IA is but one of many *distribution models* for digital products. SAC ¶¶ 24, 133, 139, 143, 155.

### 3.    Retailer Plaintiffs Do Not Adequately Allege "Plus Factors"

*No Interfirm Communications*. The SAC does not allege even a single communication about IA programs between Defendants—let alone the "high level" of communication needed to suggest an illegal agreement. *Citigroup*, 709 F.3d at 139-40. Retailer Plaintiffs gesture vaguely to "opportunities," SAC ¶ 116, for "interaction" at EPEG anti-piracy meetings (which included two publisher participants that are not even alleged to be part of any purported conspiracy), Opp. at 22, but Retailer Plaintiffs fail to plausibly connect such meetings to any particular conduct.

*No Common Motives That Suggest Agreement*. Retailer Plaintiffs contend that Defendants had a common interest in "end[ing] the online and secondary markets." Opp. at 21. However, this allegation does not support an inference of conspiracy because it "simply restate[s] the (legally insufficient) fact that market behavior is interdependent and characterized by conscious parallelism." *Citigroup*, 709 F.3d at 139.

*No Alleged Actions Against Self-Interest*. The SAC does not plausibly plead that it was against the individual economic self-interest of any Publisher or Retailer Defendant to offer IA. As explained above, the SAC reveals the opposite. *See also* Mem. at 14-17.

*No Pretextual Explanations*. Retailer Plaintiffs accuse Defendants of "blaming the Universities" as a pretext for not dealing with Retailer Plaintiffs. Opp. at 21. But branding Defendants' explanations "pretextual" simply because Retailer Plaintiffs *assume* Defendants are concealing a conspiracy is a circular argument without factual support—not a plus factor.[6]

---

[6] Moreover, Retailer Plaintiffs' only legal citation for this "plus factor" is to *Interest Rate Swaps*, which does not identify "pretextual excuses" as a plus factor. 261 F. Supp. 3d at 462-63. Rather, the claims of "pretext[]" in that case were relevant only because they strengthened the allegation that it was "improbable" for four defendants to deliver the same message on the same day, especially when the "pretext" claim was supported with factual allegations

***No Coerced Parallel Actions***.  Purported "evidence of coercion" may be a plus factor only in the case of "[c]oerced parallelism" *among conspirators*, i.e., where "participation in the conspiracy was obtained by threats of retaliation from other defendants." *Ambook Enters. v. Time Inc.*, 612 F.2d 604, 616 & n.19 (2d Cir. 1979).  Retailer Plaintiffs make no such allegation here.

## B.    Retailer Plaintiffs Do Not Allege An Unreasonable Restraint Of Trade

### 1.    Retailer Plaintiffs Fail To Allege Any *Per Se* Violation

The *per se* standard does not apply to any of the alleged conduct, Mem. at 22-24, and Retailer Plaintiffs' opposition brief fails to show otherwise.

***Trade Association Violations***.  Defendants' participation in trade associations is not within the "narrow, carefully demarcated categories held to be illegal per se." *Capital Imaging Assocs. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 542-43 (2d Cir. 1993).  In the cases Retailer Plaintiffs cite, *see* Opp. at 23-24, the *per se* rule applied not because the defendants participated in a trade association, but because there was price fixing.[7]

***Horizontal Price Fixing***.  Retailer Plaintiffs do not deny that the SAC lacks any allegations that Defendants reached agreements on price.  *See* Mem. at 23-24.  Instead, they argue that they have defined "price fixing" to include agreements on any "terms and conditions of sale."  Opp. at 25.  But they cannot expand the *per se* prohibition on price fixing by applying an epithet to whatever conduct they choose.  And although they rely on *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940), to argue that any agreement "affect[ing] price" is *per se* illegal, Opp. at 25, the Supreme Court has recognized more recently that "[n]ot all arrangements among actual or

---

explaining why that label applied.  *Id.* at 475-76.  By contrast, Retailer Plaintiffs allege that IA programs were implemented gradually over several years, and they fail to allege facts showing that Publishers participated in EPEG for any reason other than to combat counterfeiting.

[7] *Ariz. v. Maricopa Cty. Med. Soc.*, 457 U.S. 332, 357 (1982) (agreements "fit squarely into the horizontal price-fixing mold"); *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1221 (7th Cir. 1993) (conspiracy "to fix prices").

potential competitors that have an impact on price are *per se* violations of the Sherman Act or even unreasonable restraints." *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 23 (1979).

**Group Boycott**. *Per se* illegal boycotts "ha[ve] generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor." *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458 (1986). Cases relied on by Retailer Plaintiffs confirm this rule. *See* Opp. at 24-25. According to Retailer Plaintiffs, Publishers did not act against their competitors; they intended to "drive disfavored *retailers* … from the market." *Id.* at 24 (emphasis added). Thus, the *per se* rule does not apply.

**Exclusive Dealing** agreements are not *per se* illegal. Mem. at 22-23. Without disputing that principle, Retailer Plaintiffs insist that there can be a *per se* violation when exclusive agreements are "in service of horizontal restraints." Opp. at 25. However, cases cited by Retailer Plaintiffs are inapposite as each involved horizontal price fixing or group boycotts—not exclusive dealing agreements. *Id.* at 25-26.[8] And, as explained above, such conduct is not alleged here.

### 2.    Retailer Plaintiffs Fail To Define A Plausible Relevant Market

The alleged IA Materials, IA Topic, and IA Individual Course Markets are not plausibly defined. Mem. at 25-26. Retailer Plaintiffs admit that they have limited those product markets to materials sold through IA (and excluded other materials that are not "fundamentally different" and would "function as substitutes") solely because of the so-called "Inclusive Access scheme." *See* SAC ¶ 1. But the contracts through which this "scheme" is allegedly "accomplished," *id.* ¶¶ 1, 146, "are not sufficient by themselves to render interchangeable commodities non-interchangeable

---

[8] *See Apple*, 791 F.3d at 314 (agreement was properly characterized as "a horizontal price fixing-conspiracy"); *In re Elec. Books*, 859 F. Supp. 2d at 685 (agreement was "unlawful *per se* because it [was], at root, a horizontal price restraint"); *see also MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 844 (5th Cir. 2015) ("The type of conspiracy that MM alleged and that the jury found Nucor and JSW to have joined is a group boycott."); *Toys 'R' Us, Inc. v. FTC*, 221 F.3d 928, 934 (7th Cir. 2000) (involving "horizontal agreement … to boycott the warehouse clubs").

for purposes of relevant market definition." *Smugglers Notch Homeowners' Ass'n, Inc. v. Smugglers' Notch Mgmt. Co., Ltd.*, 414 F. App'x 372, 377 (2d Cir. 2011). Retailer Plaintiffs emphasize that they are not parties to the contracts at issue, Opp. at 30-31, but markets must include all products that "*consumers* treat … as 'acceptable substitutes,'" *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (emphasis added), whether or not a consumer (or a plaintiff) happened to sign a contract. *See Tru-Art Sign Co., Inc. v. Local 137, Sheet Metal Workers Int'l Ass'n*, 2013 WL 12368715, at *6 (E.D.N.Y. 2013) (applying *Smugglers' Notch* where plaintiff was not party to contract that allegedly limited scope of market).[9]

The alleged Course Materials, IA Materials, Topic, and IA Topic markets are implausibly broad because they include non-interchangeable products. Mem. at 26-27. Retailer Plaintiffs contend that their alleged markets are sufficient because they are defined by "logical parameters," Opp. at 32, but the case from which they draw support clearly explains "the general rule" that only "commodities reasonably interchangeable by consumers for the same purposes" constitute a relevant market. *E. & G. Gabriel v. Gabriel Bros.*, 1994 WL 369147, at *3 (S.D.N.Y. July 13, 1994). The exception allowing non-substitutes to be analyzed together in a single "cluster market" applies when "market shares and competitive conditions are likely to be similar." *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 117 (D.D.C. 2016). However, the SAC admits that Publishers' shares vary across different disciplines, SAC ¶ 217, and does not allege that shares are similar across all (or any) courses. Accordingly, that exception has no application here.

---

[9] Retailer Plaintiffs also argue that "Defendants' market-distorting conduct" (i.e., the alleged IA scheme) has caused there to be zero cross-elasticity of *student* demand between course materials provided through IA and other course materials. Opp. at 31. But, even if defined from the student perspective, the allegedly relevant markets cannot be limited to IA Materials because Retailer Plaintiffs admit that some universities participate in IA while others do not, SAC ¶¶ 131-32, 138, and Retailer Plaintiffs do not allege that universities conceal their participation in IA from students. *Cf. Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 87 (2d Cir. 2000) (rejecting market limited to New Haven student housing "lock in" costs because "Yale's housing policies were fully disclosed long before plaintiffs applied for admission").

### 3. Retailer Plaintiffs Fail To Allege Adverse Effects On Competition

"[T]o sustain a section 1 claim, a plaintiff must … show more than just an adverse effect on competition among different sellers of the same product." *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.*, 129 F.3d 240, 245 (2d Cir. 1997). But that is all Retailer Plaintiffs have alleged. Mem. at 27-28; *see also* Opp. at 27 ("SAC alleges the adverse impact of the conspiracy in the retail market."). The Second Circuit has held that such a reduction in intrabrand competition among distributors is not alone "a sufficient allegation of harm to competition" to sustain a rule of reason claim, even when there are allegations of "artificially inflated prices." *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 30 (2d Cir. 2006).

### 4. Retailer Plaintiffs Do Not Allege An Exclusive Dealing Claim

The SAC fails to allege that exclusive contracts have foreclosed a substantial share of the Course Materials market. Mem. at 28-29. Retailer Plaintiffs implicitly concede the point, arguing only that Defendants are "swiftly moving" in that direction. *See* Opp. at 28. They also insist that "detail about the percentage of the market foreclosed" is not required, *id.* at 27-28, but the problem is not a lack of "detail"—it is that the SAC lacks *any* allegations about how much of the Course Materials market has been allegedly foreclosed by IA. Nor have Retailer Plaintiffs alleged contracts of sufficient duration to foreclose substantial competition. Mem. at 29-30.

## IV. The Section 2 Claims Should Be Dismissed

### A. Retailer Plaintiffs Do Not Allege Monopoly Power

The market share allegations fail to establish that Defendants have monopoly power. Mem. at 30-33. For the alleged ***Course Materials*** market, Retailer Plaintiffs' claims depend on Defendants' "combined share," Opp. at 35, but "a 'shared monopoly' theory cannot support a Section 2" claim. *In re Credit Default Swaps Antitrust Litig.*, 2014 WL 4379112, at *13 (S.D.N.Y. Sept. 4, 2014). For the alleged ***Topic Markets***, the English and History definitions also rest on a

flawed "shared monopoly" theory, and the Math, Science, and Economics definitions allege that only two Publishers have market shares above 50%. Opp. at 34. Retailer Plaintiffs misleadingly suggest that a "50-70% market share [is] sufficient," *id.* at 34, but the case they cite held that the defendant *lacked* monopoly power, despite a share greater than 70%. *See Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 98-99 (2d Cir. 1998); *see also PepsiCo*, 315 F.3d at 109 (64% market share insufficient to infer monopoly power). For the alleged *IA Materials* markets, Retailer Plaintiffs argue that, at each university, "a particular Defendant Publisher dominates the supply side with 70% or more," Opp. at 34, though the SAC contains no such allegations.[10] Similarly, Retailer Plaintiffs' arguments about the alleged *Individual Course* markets are not supported by their allegations.[11]

Retailer Plaintiffs' supposed "direct evidence" of monopoly power fails to make up for their deficient market share allegations. Despite citing to sixty-eight different paragraphs, Opp. at 33, Retailer Plaintiffs do not identify any factual allegations showing that any Defendant individually can control prices or exclude competition.[12]

### B.    Retailer Plaintiffs Do Not Allege Anticompetitive Conduct

Retailer Plaintiffs cannot clear the high bar for unilateral refusal to deal claims under *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). They do not allege that Publishers have ever sold them course materials through IA, and allegations

---

[10]  There are allegations that Publishers' shares *collectively* exceed 70%, SAC ¶¶ 223, 362, but only each Publisher's individual share is relevant, *In re Credit Default Swaps*, 2014 WL 4379112, at *13. And allegations concerning "sell through" rates in particular courses, SAC ¶¶ 37-38, 151, 179, 189, 248, shed no light on a Publisher's share of the course materials sold for all courses at a university.

[11]  *Compare* Opp. at 33 (citing SAC ¶ 218 to support claim that a Publisher has a "dominant position in *each*" market) (emphasis added) *with* SAC ¶ 218 (alleging that a Publisher has "monopoly control over *a subset* of these markets") (emphasis added).

[12]  Conclusory allegations may be disregarded. *See* SAC ¶¶ 223-224; *Bell Atl. v. Twombly*, 550 U.S. 544, 556-57 (2007); *Dane v. United Healthcare Ins. Co.*, 974 F.3d 183, 188 (2d Cir. 2020) ("[Courts] are not required to credit conclusory allegations.").

about sales of *other* course materials do not establish a prior course of dealing involving *IA*, much less that Publishers sacrificed profits by not enabling them to sell course materials through IA. Likewise, Retailer Plaintiffs' "re-design" claim fails because the SAC does not allege that Publishers stopped selling printed textbooks; without such an allegation, consumers could not be coerced into using IA. *See Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 286-88 & n.39 (2d Cir. 1979) (introducing new product was not a violation when defendant did not "ceas[e] producing" old product).[13]

## V.      The Robinson-Patman Act ("RPA") Claims Should Be Dismissed

Retailer Plaintiffs do not explain how they simultaneously suffered from a refusal to deal in violation of the Sherman Act, *see* SAC ¶¶ 287, 348, and price discrimination under the RPA. Retailer Plaintiffs also concede they must allege harm to their "ability to compete" from *sales* at discriminatory prices. *See* Opp. at 37. But they point to only two discrete sales—one involving Pearson and Follett, SAC ¶ 288, and one involving Pearson and Barnes & Noble, *id.* ¶ 290. Isolated instances of discrimination, such as those alleged in the SAC, are not actionable. *See Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 180 (2006).[14] Finally, Retailer Plaintiffs do not dispute that IA is not a *commodity* covered by the RPA. Rather, it is a business model or "delivery system" for "digital subscriptions." *See, e.g.*, SAC ¶¶ 1, 24, 185, 241; *Innomed Labs, LLC v. ALZA Corp.*, 368 F.3d 148 (2d Cir. 2004) (intangible products are not commodities).[15]

---

[13]  *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187 (S.D.N.Y. 2019), is inapposite. There, the court permitted a re-design claim only where it was combined with plausible "allegations of exclusive dealing, tying agreements, and product disparagement," *id.* at 212-15, which is not the case here.

[14]  Retailer Plaintiffs cite *Coalition for a Level Playing Field, LLC v. Autozone, Inc.*, but that case only confirms that Retailer Plaintiffs' failure to allege sales involving Cengage and McGraw Hill is fatal to their RPA claim. 2001 WL 1763440, at *2 (E.D.N.Y. Oct. 18, 2001) ("*each* plaintiff 'must allege facts pertaining to *each* of the elements of the claim,'" in that case an appendix with details of actual sales) (emphasis added).

[15]  That IA is a *method* of delivery providing access to *digital* course materials distinguishes it from the cases about physical books that Retailer Plaintiffs cite. *See* Opp. at 38.

**VI.    Retailer Plaintiffs' State Law Claims Should Be Dismissed**

Retailer Plaintiffs do not dispute that dismissal of their federal claims would foreclose state law relief for the same reasons.  Retailer Plaintiffs' responses to the additional, independent bases for dismissal identified by Defendants are unavailing.  Retailer Plaintiffs contend that they have AUPA standing because "the SAC alleges price discrimination."  Opp. at 39.  However, even if the SAC adequately alleged "price discrimination" in general (which it does not), that is not enough; the AUPA requires specific allegations that Defendants sold products for less in one part *of Arkansas* than in another.  Ark. Code § 4-75-207.  That is not alleged here.  Likewise, Retailer Plaintiffs' allegation that they "purchase Course Materials" which they resell to students in competition with Defendants, Opp. at 39-40, does not confer NMUPA standing because, as Retailer Plaintiffs acknowledge, *id.*, the NMUPA authorizes claims only by *consumers*, not competitors.  Mem. at 39.  As regards unjust enrichment, the SAC does not include allegations that *Retailer Plaintiffs* "directly" or "willingly" conferred any unfair benefit on Defendants as required under Kentucky and Tennessee law.  *See* Mem. at 40.  Finally, most Texas courts do not recognize unjust enrichment claims and, in any event, Retailer Plaintiffs cannot show that Defendants took "undue advantage" of them simply by alleging that *students* paid higher prices.  *See id*.

**VII.    Conclusion**

The Court should grant Defendants' motion to dismiss.  Retailer Plaintiffs' application for leave to amend should be denied.  After three opportunities to replead, any further amendment would be futile.  Consistent with the Court's prior order indicating that it would likely not permit leave to further amend, ECF No. 17, the Court should dismiss the SAC with prejudice.

Dated: March 9, 2021

Respectfully Submitted,

s/ Rachel S. Brass (by consent)
Rachel S. Brass
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, California 94105-0921
Telephone: (415) 393-8293
rbrass@gibsondunn.com

Adam J. Di Vincenzo
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: (202) 887-3704
adivincenzo@gibsondunn.com

On behalf of Defendants Barnes & Noble
College Booksellers, LLC and Barnes &
Noble Education, Inc.

s/ Craig C. Martin
Craig C. Martin
Matt D. Basil
WILLKIE FARR & GALLAGHER LLP
300 N. LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 728-9000
cmartin@willkie.com
mbasil@willkie.com

On behalf of Defendant Follett Higher
Education Group, Inc.

s/ Eric Mahr (by consent)
Eric Mahr
Andrew J. Ewalt
Richard Snyder
Lauren Kaplin
FRESHFIELDS BRUCKHAUS
DERINGER US LLP
700 13th Street NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
eric.mahr@freshfields.com
andrew.ewalt@freshfields.com
richard.snyder@freshfields.com
lauren.kaplin@freshfields.com

On behalf of Defendant Cengage
Learning, Inc.

s/ W. Cavanaugh, Jr. (by consent)
William F. Cavanaugh, Jr.
Saul B. Shapiro
Amy N. Vegari
PATTERSON BELKNAP WEBB &
TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
Telephone: (212) 336-2000
wfcavanaugh@pbwt.com
sbshapiro@pbwt.com
avegari@pbwt.com

On behalf of Defendant McGraw Hill
LLC

s/ J. Quinn-Barabanov (by consent)

Jennifer Quinn-Barabanov
Zachary B. Schreiber
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
jquinnba@steptoe.com
zschreiber@steptoe.com

Michael Dockterman
STEPTOE & JOHNSON LLP
227 W Monroe Street, Suite 4700
Chicago, Illinois 60606
Telephone: (312) 577-1300
mdockterman@steptoe.com

*On behalf of Defendant Pearson
Education, Inc.*